# 24-13466

# United States Court of Appeals
### for the
# Eleventh Circuit

MICHAEL SULLIVAN, WILLIAM SCHREINER, TRAVIS DAGENAIS,
BRETT TAYLOR, JOHN HOGUE, et al.,

*Plaintiffs/Appellants,*

– v. –

SARASOTA COUNTY, FL,

*Defendant/Appellee.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
CASE NO: 8:22-cv-01605-SPF
(Hon. Sean P. Flynn)

# INITIAL BRIEF OF APPELLANT

TAMARA IMAM
MOONEY GREEN SAINDON MURPHY & WELCH
1920 L Street NW, Suite 400
Washington, DC 20036
(202) 783-0010

*Counsel for Plaintiffs/Appellants*

CP COUNSEL PRESS   (800) 4-APPEAL •

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE</u>
## <u>DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 and 28-1(b), Appellants respectfully submit a complete list of all persons and entities known to have an interest in the outcome of this appeal:

1. Egan, Lev & Siwica, PA
2. Flynn, Sean P., United States Magistrate Judge, Middle District of Florida
3. Hackman Parker, LLC
4. International Association of Fire Fighters (IAFF)
5. Imam, Tamara, Counsel for Plaintiffs/Appellants
6. Leff, Peter, General Counsel to the IAFF
7. McDermott, Lauren, Counsel for Plaintiffs/Appellants
8. Mooney, Green, Saindon, Murphy & Welch, P.C.
9. Murphy, Mark, Counsel for Plaintiffs/Appellants
10. Parker, Heidi, Counsel for Plaintiffs
11. Siwica, Richard, Counsel for Plaintiffs

No publicly traded company or corporation has an interest in the outcome of this case or appeal.


/s/Tamara Imam
Tamara Imam

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Plaintiffs-Appellants respectfully request oral argument. This appeal concerns whether certain Sarasota County Fire Department fire fighters are entitled to overtime pay under the Fair Labor Standards Act and its implementing regulations — specifically, the First Responder Regulation, 29 C.F.R § 541.3(b). Appellants contend, among other things, that the district court erred in its application of the First Responder Regulation to the overtime exemptions in 29 U.S.C. § 213(a)(1). As the Eleventh Circuit has not yet interpreted or applied this regulation, Appellants believe that the opportunity to answer questions posed by the panel will assist the Court in making a determination as to the issues raised herein.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...............................................i

TABLE OF AUTHORITIES ..................................................................................iv

JURISDICTIONAL STATEMENT .........................................................................1

STATEMENT OF THE ISSUES..............................................................................1

STATEMENT OF THE CASE..................................................................................2

     A.    Procedural History...................................................................................2

     B.    Statement of Relevant Facts ...................................................................3

              Battalion Chiefs' Inclusion in the Bargaining Unit ..............................5

              Battalion Chiefs' Emergency Response Duties ......................................7

              Administrative Duties ..........................................................................11

              "Acting" Battalion Chief Role ..............................................................15

              BC Job Description/Time Spent Performing Exempt v. Non-exempt Work ........................................................................................15

              Assistant Fire Chief Role .....................................................................16

STANDARD OF REVIEW .....................................................................................17

SUMMARY OF ARGUMENT ................................................................................18

ARGUMENT ..........................................................................................................20

I.     THE DISTRICT COURT ERRED IN FINDING BCS ARE NOT "FIRST RESPONDERS" UNDER 29 C.F.R. § 541.3(b) ..............................22

     A.    Primary Duty and the First Responder Regulation ..............................22

     B.    There are Genuine Issues of Material Fact Regarding BCs' Primary Duty .......................................................................................25

          1.    Importance of BCs' Emergency Response Role ......................26

          2.    BCs' Frontline Firefighting Duties ..........................................29

ii

        3.      Time Spent on Exempt Activities ............................................... 32

II.    THE DISTRICT COURT ERRED IN FINDING BATTALION
       CHIEFS' ON-SCENE MANAGEMENT AND OFF-SCENE
       DUTIES DO NOT FALL UNDER 29 C.F.R. § 541.3(b) ............................ 34

      A.    On-Scene Management ........................................................ 35

      B.    Off-Scene Management ....................................................... 38

III.   THE DISTRICT COURT ERRED IN FINDING BATTALION
       CHIEFS ARE EXEMPT "EXECUTIVE" EMPLOYEES UNDER
       29 C.F.R. § 541.100 ............................................................................ 40

      A.    Hiring Panels ..................................................................... 42

      B.    Evaluations ........................................................................ 43

      C.    Disciplinary Process .......................................................... 45

CONCLUSION ................................................................................................. 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .................................................................................17

*Auer v. Robbins*,
   519 U.S. 452 (1997) .................................................................................23

*Barrows v. City of Chattanooga*,
   944 F. Supp. 2d 596 (E.D. Tenn. 2013) ........................................ 32, 34, 38, 39

*Battle v. Bd. of Regents for the State of Ga.*,
   468 F.3d 755 (11th Cir. 2006) ................................................................17

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .................................................................................17

*Chevron U.S.A., Inc. v. NRDC*,
   467 U.S. 837 (1984) .................................................................................23

*Emmons v. City of Chesapeake*,
   982 F.3d 245 (4th Cir. 2020) ....................................................24-25, 29, 35, 43

*Encino Motorcars, LLC v. Navarro*,
   584 U.S. 79 (2018) .......................................................................... 21, 22

*Fikes v. Abernathy*,
   793 F. App'x 913 (11th Cir. 2019) ............................................... 29, 31

*Heron Dev. Corp. v. Vacation Tours, Inc.*,
   814 F. App'x 468 (11th Cir. 2020) ............................................... 29, 31

*Hinkle v. Midland Credit Mgmt., Inc.*,
   827 F.3d 1295 (11th Cir. 2016) ..............................................................17

*Hornsby-Culpepper v. Ware*,
   906 F.3d 1302 (11th Cir. 2018) ..............................................................17

*Icicle Seafoods, Inc. v. Worthington*,
   475 U.S. 709 (1986) .................................................................................25

*In re Holywell Corp.*,
   913 F.2d 873 (11th Cir. 1990) ................................................................20

*Klinedinst v. Swift Invs., Inc.*,
   260 F.3d 1251 (11th Cir. 2001) ...................................................... 22, 40

*Latimer v. Roaring Toyz, Inc.*,
   601 F.3d 1224 (11th Cir. 2010) ...................................................... 17, 26

*Loper Bright Enterprises v. Raimondo*,
   144 S. Ct. 2244 (2024) ....................................................................23

*Maestas v. Day & Zimmerman, LLC*,
   664 F.3d 822 (10th Cir. 2012) ...................................................... 24, 25

*Morgan v. Family Dollar Stores, Inc.*,
   551 F.3d 1233 (11th Cir. 2008) ...................................................... 22, 33

*Morrison v. County of Fairfax*,
   826 F.3d 758 (4th Cir. 2016) ....................................................... *passim*

*Mullins v. City of NY*,
   653 F.3d 104 (2d Cir. 2011) ....................................................... *passim*

*Ramirez v. Statewide Harvesting & Hauling, LLC*,
   997 F.3d 1356 (11th Cir. 2021) ..........................................................21

*Strickland v. Norfolk S. Ry.*,
   692 F.3d 1151 (11th Cir. 2012) ...................................................... 18, 41

*United States v. Boler*,
   115 F.4th 316 (4th Cir. 2024) ............................................................23

*Vickery v. City of Rowell*,
   No. 1:22-cv-02986-VMC, 2024 BL 372789 (N.D. Ga. Aug. 9,
   2024) ................................................................ 25, 38, 39, 45

*Warrior Tombigbee Transp. Co. v. M/V Nan Fung*,
   695 F.2d 1294 (11th Cir. 1983) ..........................................................18

*Watkins v. City of Montgomery*,
   775 F.3d 1280 (11th Cir. 2014) ..........................................................25

**Statutes & Other Authorities:**

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1331 ...................................................................................1

29 U.S.C. § 201 ................................................................................1, 2

29 U.S.C. § 206 ............................................................................ 3, 20

29 U.S.C. § 207(a)(1) .................................................................. 3, 20

29 U.S.C. § 207(k) ....................................................................... 3, 20

29 U.S.C. § 216(b) ..........................................................................1, 2

29 C.F.R. § 541.3(b) .................................................................. *passim*

29 C.F.R. § 541.3(b)(2) ............................................ 24, 25, 34, 35

29 C.F.R. § 541.3(b)(3) ...................................................................24

29 C.F.R. § 541.100 ......................................................... 1, 24, 40

29 C.F.R. § 541.100(a) ............................................................. 19, 22

29 C.F.R. § 541.100(a)(4) ...............................................................40

29 C.F.R. § 541.105 ................................................................. 41, 47

29 C.F.R. § 541.700(a) .......................................... 22, 23, 32, 33

29 C.F.R. § 553.230 ...........................................................................3

Fed. R. Civ. P. 56(c) .......................................................................17

Fl. Stat. § 633.508 ...........................................................................10

69 Fed. Reg. 22,122 (Apr. 23, 2004) ........................................ 23, 24

## JURISDICTIONAL STATEMENT

This appeal is from the entry of summary judgment against Appellants on their claims for unpaid overtime wages under § 216(b) of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*. The district court had subject matter jurisdiction pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. § 1331. The district court's summary judgment order is a final decision of the district court that disposed of all parties' claims. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

The district court's summary judgment order was entered on September 30, 2024. Doc. 101. Plaintiffs timely filed their notice of appeal on October 22, 2024. Doc. 104.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in finding that Appellants are not "first responders" under 29 C.F.R. § 541.3(b)?

2. Whether the district court erred in finding that Appellants' on-scene and off-scene managerial duties do not fall under 29 C.F.R. § 541.3(b)?

3. Whether the district court erred in finding that Appellants are exempt "executive" employees under 29 C.F.R. § 541.100?

**A. Procedural History**

On July 15, 2022, Plaintiffs-Appellants filed this collective action[1] against Defendant-Appellee for failure to pay overtime wages in violation of the Fair Labor Standards Act, as amended ("FLSA"), 29 U.S.C. § 201, *et seq.*[2] Doc. 1. The parties consented to proceed with a magistrate judge. Docs. 31-32.

After the close of discovery, Appellants filed a motion for partial summary judgment, seeking summary judgment only as to Appellee's liability. Doc. 80. Appellee cross-moved for summary judgment. Doc. 61. On September 30, 2024, the district court issued an order granting Appellee's motion for summary judgment, denying Appellants' partial motion for summary judgment, and entering final judgment against Appellants. Docs. 101, 102.

In its decision, the district court held Appellants' "exempt managerial duties generally outweigh any non-exempt duties they may have" and, therefore, Appellants are exempt executives not entitled to overtime under the FLSA. Doc. 101 at 24. In doing so, the district court ignored material facts favorable to Appellants

---

[1] Plaintiffs filed their Complaint as a collective action pursuant to 29 U.S.C. § 216(b) but ultimately did not move for conditional certification and instead pursued relief as to the named Plaintiffs only.

[2] On July 19, 2022, the district court struck Plaintiffs' Complaint as an impermissible shotgun pleading. *See* Doc. 8. On July 27, 2022, Plaintiffs filed their Amended Complaint, which was the operative pleading before the district court. Doc. 10.

and engaged in inappropriate factfinding and weighing of the evidence — functions reserved exclusively for a jury. Appellants timely appealed. Doc. 104.

**B.** **Statement of Relevant Facts**

Appellants are current or former Battalion Chiefs ("BCs") employed by the Sarasota County Fire Department ("Fire Department" or "SCFD") in Sarasota County, Florida ("County"). Doc. 10 at 3, ¶ 11. Like other shift personnel, BCs work a repeating schedule of 24 hours on-duty followed by 48 hours off-duty, within a 21-day work cycle. Doc. 80-1 at 5. BCs are the only employees assigned to a 24-hour shift who do not receive overtime compensation at time and one-half their regular rate for the hours they work above the applicable FLSA threshold.[3] Doc. 80-3 at 4, ¶¶ 9-10.

The County (the Appellee) operates the SCFD, which is a subdivision of the County's broader Emergency Services Department. Doc. 80-4 at 62. The SCFD is an all-hazards department that provides fire suppression, emergency medical

---

[3] The FLSA requires covered employers to pay employees a minimum hourly wage and overtime. See 29 U.S.C. § 206. Generally, the FLSA requires employers to pay employees a "rate not less than one and one-half times their regular rate for hours worked in excess of forty in a workweek." § 207(a)(1). Public employers who adopt an alternative § 7(k) work period are not required to pay overtime until the number of hours that the employee works in the work period exceeds the ratio of 212 hours to 28 days. 29 U.S.C. § 207(k). Here, the County has adopted an alternative 21-day work period. Doc. 80-1 at 5. As such, the County must pay non-exempt employees time and one-half overtime for all hours worked above 159 hours in each 21-day work period. 29 C.F.R. § 553.230.

services ("EMS"), and special operations services to approximately 430,000 County residents, covering 451 square miles over four municipalities.[4] *Id.* at 10.

The SCFD is organized in a paramilitary fashion consisting of a rank structure, with the Fire Chief at the highest rank. *Id.* at 62-63. Immediately below the Fire Chief are two Deputy Fire Chiefs, who manage the SCFD's two divisions: Operations and Administration. *Id.* In Operations, where BCs are housed, the Deputy Fire Chief of Operations oversees fire operations, EMS operations, and all other special programs. *Id.* at 62. In 2022, the SCFD added four additional Assistant Fire Chiefs ("AFCs") to increase staffing at the senior management level. *Id.* at 57. Currently, seven AFCs oversee the SCFD's fire suppression program. *Id.* Notably, BCs are *not* included in any SCFD organizational chart designating "senior management." *See id.* at 62-63.

At the shift personnel level, the SCFD is subdivided into four battalions, with one BC overseeing each battalion. *Id.* at 73. Below the rank of BC are Captains and Lieutenants, who are above rank-and-file Fire Fighters in the chain of command. Doc. 67 at 17, 14-16. Shift personnel are considered line personnel and are included in the SCFD's daily minimum staffing requirements. AFCs and above do not count

---

[4] In 2023, the SCFD published a comprehensive report of its services and programs, entitled SCFD Community Risk Assessment/Standards of Cover ("CRA"). Doc. 80-4.

toward the minimum staffing requirements. Doc. 80-4 at 94-96; Doc. 67 at 82-83; Doc. 73 at 47, 44:8-21.

## Battalion Chiefs' Inclusion in the Bargaining Unit

The Suncoast Professional Fire Fighters and Paramedics, International Association of Fire Fighters Local No. 2546 ("Local 2546" or "Union"), is a labor organization representing certain employees of SCFD. *See* Doc. 80-1 at 4. In 1999, Local 2546, which then only represented SCFD fire fighters below the rank of BC, filed a unit clarification petition before the Florida Public Employees Relations Commission ("FPERC"), seeking to include employees in the BC classification into the bargaining unit. Doc. 83-11. As part of these proceedings, the Union and the County filed joint stipulations of fact, which revealed that the BC position was not properly classified as supervisory under Florida labor law. *Id.* As summarized by FPERC:

> In the present petition, the joint stipulations and documentation filed by the parties reveal that the Battalion Captain position has been retitled to Battalion Chief, and that the classification's duties have been changed since it was designated supervisory.
>
> Specifically, the Battalion Chiefs no longer effectively recommend hiring and promotion of subordinates or have the authority to establish or change work schedules. The transfer of employees between shifts and fire stations is currently done according to departmental policy and the Battalion Chiefs do not exercise any discretion in this area. Further, the Battalion Chiefs no longer evaluate subordinates in a manner which may adversely affect any term or condition of employment.

The Battalion Chiefs may approve leave requests, but this function is ministerial in nature and does not involve the exercise of any discretion. Battalion Chiefs no longer have authority to resolve employee grievances. While Battalion Chiefs maintain the authority to discipline subordinates with oral and written reprimands, captains and lieutenants who are members of the bargaining unit have the same authority regarding the issuance of oral reprimands.

Although the Battalion Chiefs still do not normally engage in fire suppression activities they are required to be certified firefighters, and those who are assigned to shift work will respond to major emergencies and perform investigations regarding the cause and origin of fires. Thus, Battalion Chiefs share the significant risks associated with fighting fires due to their proximity to dangerous fire scenes and their need to act under extreme conditions as a part of their duties. Further, the Battalion Chiefs and unit members wear the same uniform and share living, eating, and recreational facilities. The Battalion Chiefs and unit members are also subject to the same physical requirements and retirement provisions.

*Id.*

On these facts, FPERC concluded that BCs did not "possess significant supervisory duties which would create a conflict of interest with unit members" and granted the Union's unit clarification petition. *Id.* at 5. Consequently, BCs are members of the bargaining unit, and the terms and conditions of their employment are governed by a collective bargaining agreement ("CBA") between the Union and the County. Doc. 80-1.

## Battalion Chiefs' Emergency Response Duties

BCs are required to undergo substantially the same emergency response training as lower-ranked fire fighters.[5] Doc. 80-2 at 7-8, ¶¶ 17-20; Doc. 80-3 at 6-7, ¶¶ 18-21; Doc. 80-1 at 8-11. Along with all other line personnel, BCs are issued two sets of personal protective equipment ("PPE") for use in their fire suppression and emergency response duties. Doc. 80-8 at 3; *see also* Doc. 80-2 at 8, ¶ 21; Doc. 80-3 at 8, ¶ 22. BCs respond to emergency incidents in SCFD-issued SUVs, which are equipped with basic lifesaving ("BLS") equipment, Rapid Intervention Crew ("RIC") equipment, an axe, and forcible entry tools, as well as GPS preemption and radio enhancement technology. Doc. 80-9 at 5, 26:1-2, 16-18; Doc. 80-2 at 9, ¶¶ 22, 24-25; Doc. 80-3 at 8, ¶ 23, 9, ¶¶ 25-26. The County considers the BC vehicles "emergency vehicles for fire suppression." Doc. 80-4 at 74; *see also* Doc. 80-2 at 9, ¶ 22; 80-3 at 8, ¶ 23.

As line personnel — which the SCFD defines as "anybody who responds on a 24-hour basis, [who] is assigned to a fire station [and is] in the response mode," Doc. 73 at 130, 127:13-21 — BCs are automatically dispatched to numerous fire and medical calls in accordance with the SCFD's dispatch matrix. *See* Doc. 80-10; Doc. 80-2 at 10-11, ¶ 28; Doc. 80-3 at 9-10, ¶ 27. Pursuant to this matrix, BCs are

---

[5] The only exceptions are that BCs do not have to undergo driver training, because they do not drive a fire apparatus, or fire pre-planning training. *See* Doc. 80-1 at 8-11.

dispatched to the following incident types: first alarm medical, second alarm medical, mass casualty levels 1 and 2, sinking vehicle, traffic crash with extrication, traffic crash with hazmat, train crash, suspicious device, active shooter, aircraft emergency, alarm-chlorine, explosion, bio-chemical-nuclear, back country rescue, fire-boat-dock shoreline, fire-boat-land, brush fire-large, fire-brush with exposure, confined space rescue, extrication, gas order-inside, high level rescue, hazmat fire-large, hazmat fire-small, hazmat incident, marine rescue, fire-outside with exposure, odor of smoke-inside, fire-public service, structure collapse, structure fire, fire-commercial, fire-high life hazard, fire-high rise, fire-marina, fire-truck-vehicle cargo, fire-unknown situation, and fire-vehicle with exposure. Doc. 80-10.[6] Some emergency incidents — namely, structure fires, commercial fires, and high-rise fires — require two BCs to respond. *See id.*; *see also* Doc. 80-13 at 3, ¶ 5. BCs have no discretion whether to respond to a call to which they are dispatched. Doc. 80-2 at 10-11, ¶ 28; Doc. 80-3 at 10, ¶ 28.

Upon deployment to the scene of an incident, BCs may assume one or more response positions or roles. Doc. 80-3 at 11-16, ¶¶ 32-50. For instance, on the scene of a structure fire, the first arriving BC typically assumes the role of the Incident Commander ("IC"). *Id.* at 11, ¶ 32. The IC assesses the scene and is ultimately

---

[6] On the dispatch matrix, incidents to which BCs are automatically dispatched are designated by the acronym "BN."

responsible for coordinating the dispatched unit's response to the fire. *Id.* In this capacity, the IC must conduct a full 360-degree walk-around of the burning structure to assess hazards on scene. *Id.* In cases of complex or large-scale fires, the IC must don full PPE while conducting the 360-degree walk-around to protect against conditions immediately dangerous to life or health ("IDLH"). *Id.*; Doc. 80-11 at 3-4, ¶¶ 6-10.

Further, BCs are trained and required to engage in frontline firefighting, even in the IC role, if the scale and complexity of the fire necessitates it. *See* Doc. 80-9 at 4, 9:1-12 (explaining that even in the role of IC, BCs must engage in frontline firefighting where necessary to mitigate emergency incident); Doc. 80-12 at 3, 11:15-19 (same); Doc. 80-8 at 8 (providing that where there is a need for "immediate tactical activity" on the scene of an emergency incident, command in the "offensive mode" will be initiated). Importantly, however, the role of IC is not exclusive to BCs; Captains and Lieutenants, both of whom are lower ranked than BCs and are non-exempt employees, also regularly act as the IC on a fire scene. *See* Doc. 80-3 at 11-12, ¶¶ 34-35.

The second BC to arrive on the scene of a structure fire serves in another position, such as the Incident Safety Officer ("ISO"), part of an initial RIC ("IRIC"), or part of the "2 in/2 out" team. Doc. 80-2 at 13, ¶ 35; Doc. 80-3 at 12, ¶ 35. Most commonly, the second arriving BC acts in the role of ISO, *see* Doc. 80-3 at 12, ¶¶

36-38, who is responsible for monitoring the condition and activities of the emergency response, as well as navigating all parts of the incident scene to identify hazards and IDLH conditions. Doc. 80-8 at 23. The ISO routinely dons full PPE. Doc. 80-3 at 14-15, ¶ 45; Doc. 80-11 at 4-6, ¶¶ 11-20; Doc. 80-13 at 3-4, ¶¶ 8-12; Doc. 80-14 at 3-4, ¶¶ 9-13. Further, because of the dynamic nature of emergency incidents, it is common for the ISO to engage in frontline firefighting and to enter the burning structure. Doc. 80-15 at 3, 11:2-14 (explaining that BC serves as ISO more often than as IC, and that as ISO, he "go[es] into quite a bit of frontline firefighting situations" and "[j]ust as any other firefighter," he dons PPE in this role); Doc. 80-16 at 4, 10:4-9 (explaining that he has served as ISO "numerous times" as a BC and that ISO role involves "frontline" firefighting); Doc. 80-17 at 3, 14:24-24, 15:1 ("As [IC] you're not necessarily going inside of the building, but as [ISO], often times you do.").

BCs also serve as members of an IRIC, whose function is to be prepared to rescue and assist fellow fire fighters in distress at the outset of an incident. Doc. 80-8 at 24. In this role, BCs operate as members of the "2 in/2 out" team, which is required by Florida law and SCFD policy to reduce the risk of a fire fighter being trapped or otherwise injured while in a burning structure. *See* Fl. Stat. § 633.508;

Doc. 80-8 at 28-29.[7] BC vehicles contain RIC equipment, and the vehicles themselves may be utilized during RIC operations. Doc. 80-15 at 4, 26:1-4, 13-25 (explaining that BC SUVs are "one of the few vehicles that carry the rescue equipment that [is] necessary if a firefighter gets trapped" and have better access than other vehicles). BCs on an IRIC must don full PPE. Doc. 80-3 at 15, ¶ 46.

### Administrative Duties

When not responding or preparing to respond to an emergency, BCs perform some ancillary administrative duties for the SCFD. These duties are essentially ministerial in nature, and BCs are afforded minimal discretion or independent judgment in performing them. Doc. 80-3 at 16, ¶ 51; Doc. 80-2 at 17, ¶ 50. These tasks are often performed by other, non-exempt line personnel. Doc. 80-3 at 16-17, ¶ 53. For instance, while BCs have some responsibilities related to payroll, scheduling, and staffing, they merely input predetermined data into a highly automated computer software program utilized by the SCFD known as Telestaff. Doc. 80-2 at 20-21, ¶ 61; Doc. 80-3 at 19, ¶ 62. This software is programmed to automatically apply SCFD rules and regulations and leaves BCs with little to no discretion. Doc. 80-3 at 19-21, ¶¶ 62-65.

---

[7] In situations where a RIC team is assigned and in place, the RIC team satisfies the 2 in/2 out policy. Doc. 80-8 at 30.

With respect to payroll, BCs simply ensure that the Telestaff system accounts for each fire fighter's entire 24-hour shift period — whether the fire fighter worked his/her full 24-hour shift or was on leave, otherwise absent, or tardy. Doc. 80-3 at 20, ¶ 64; Doc. 80-16 at 5, 22:3-21 (BCs merely enter the requisite pay "codes" established by the Administration Division). BCs then submit the payroll entries to management for review, verification, and processing. Doc. 80-2 at 21 ¶ 63; Doc. 80-3 at 20, ¶ 64.

BCs have no discretion to add additional codes to Telestaff or to approve or disapprove an employee's leave requests. Doc. 80-3 at 18-19, 21, ¶¶ 59, 61, 66. For instance, with regard to sick leave, BCs simply remind their subordinates of their responsibility to provide a doctor's note before returning to work, instruct personnel on the SCFD's established procedures for calling in sick, and enter the sick leave code into Telestaff to indicate that the employee was absent from his or her shift due to illness. *Id.* at 18, ¶ 59; Doc. 80-8 at 37-38. Additionally, BCs do not have the authority to make substantive changes to employee payroll records; such changes are made by the payroll department. Doc. 80-2 at 22, ¶ 67; Doc. 80-3 at 21, ¶ 68. For example, if an employee's pay rate or banked leave are incorrect in Telestaff, BCs are not authorized to correct these errors. *Id.* Additionally, BCs do not have access to all administrative pay codes. Doc. 80-2 at 21-22, ¶¶ 64-67; Doc. 80-3 at 20-21, ¶¶ 65-68.

A BC's role in the daily scheduling of staff is even more ministerial in nature. Scheduling and staffing of fire fighters are established pursuant to a bi-annual bidding process — in which BCs themselves, as members of the bargaining unit, also participate. Doc. 80-2 at 18, ¶ 53; Doc. 80-3 at 17, ¶ 54; Doc. 80-1 at 7; Doc. 80-8 at 31-36. The pre-established schedule, minimum daily staffing requirements, the SCFD's rules and regulations, and the individual fire fighters' leave balances are all pre-loaded into Telestaff. Doc. 80-3 at 19, ¶ 62.

If staffing must be adjusted to ensure minimum staffing, the BC simply marks the individual absent and presses a button that says "fill by rule." Doc. 80-2 at 21, ¶ 62; Doc. 80-3 at 20, ¶ 63. Telestaff then automatically places an appropriate individual in the open spot. *Id*. Telestaff will even notify the fire fighter who has been selected. *Id.* The BCs' role in daily staffing is robotic in nature, with limited discretion highly constrained by SCFD policy. Additionally, Captains and Lieutenants who serve as "acting BCs" perform the same ministerial duties, and the County pays them overtime wages. Doc. 80-2 at 17-18, ¶ 52; Doc. 80-3 at 16-17, ¶ 53.

A BC's authority to discipline is also significantly limited. The only discipline a BC can issue is an oral reprimand, known as a Form 103 counseling. Doc. 80-2 at 23, ¶ 71; *see* Doc. 80-25. An oral reprimand is the lowest form of discipline an SCFD employee may receive and can also be issued by Captains and Lieutenants. Doc. 80-

3 at 22, ¶ 71; Doc. 80-18 at 3, 15:23-25, 16:1-19. BCs may also be asked to provide a report describing an eyewitness account of facts that may lead to discipline, which is required of any fire fighter (regardless of rank) who witnesses such an incident. Doc. 80-17 at 4, 24:5-25. BCs do not make recommendations regarding whether, or what type, of discipline may be appropriate. Doc. 75 at 27, 25:1-18.

With respect to hiring and promotions, BCs, along with fire fighters of any rank, may serve on panels in which candidates are asked to respond to a series of pre-set interview questions. Doc. 80-12 at 4, 17:1-25, 18:1-2. Participation in these panels is not part of a BC's job responsibilities — it is entirely voluntary and takes place when the BC is off-duty. Doc. 80-2 at 23, ¶ 70; Doc. 80-3 at 22, ¶ 71. Panelists do not have discretion to deviate from the pre-determined questions, and the panel scores are aggregated; no one panelist's score is given more weight than another's. Doc. 80-19 at 3, 22:9-25, 23:1-25. Moreover, the evidence of record suggests that the rankings of the panel as a whole may not bear any weight on the County's hiring/promotional practices. Doc. 80-23 at 3, 19:7-18 (County hired individuals not recommended by the panel and did not give second interviews to candidates the panel recommended).

Critically, if a BC is dispatched to an emergency incident while in the midst of performing *any* of these administrative duties, the BC must immediately drop

what he is doing and respond to the incident. Doc. 80-2 at 10-11, ¶28; Doc. 80-3 at 10, ¶ 28. This is because emergency response is a BC's most important job duty. *Id.*

## "Acting" Battalion Chief Role

Many of the administrative tasks performed by BCs can be (and often are performed) by other station officers such as Captains and/or Lieutenants. Doc. 80-2 at 17-18, ¶ 52; Doc. 80-3 at 16-17, ¶ 53. Despite Captains and Lieutenants having similar decision-making authority and performing similar administrative/managerial tasks, they are recognized by the County as non-exempt employees entitled to overtime under the FLSA. *Id.* In fact, Captains and Lieutenants are paid overtime pursuant to the FLSA while serving as "acting" BCs and performing precisely the same job duties and responsibilities that the County relies on to deny overtime to BCs under the FLSA. *Id.* Lieutenants and Captains also receive a "pay additive" to function as an acting BC for the shift. *Id.* This pay additive makes the hourly rate paid to acting BCs (for non-overtime hours) similar to or equivalent to the straight time rate paid to BCs. *Id.* When working overtime in the acting role, Captains and Lieutenants earn more in wages than BCs because they are paid time and one-half. *Id.*

## BC Job Description/Time Spent Performing Exempt v. Non-exempt Work

In 2022, SCFD published a job description for the BC position. Doc. 80-20. The document provides a percentage breakdown of the position's "essential

functions," purportedly based on the percentage of "work time and associated tasks." *Id.* According to this breakdown, BCs spend over 65% of their time performing administrative and supervisory duties. *Id.* SCFD has never performed any kind of audit to determine the actual percentage of time BCs spend on their respective job duties or to verify that the percentages listed in the job description mirror the work performed by BCs. *See* Doc. 80-21 at 4-5, 24:8-22, 25:1-20. In fact, no one from SCFD could explain how these percentages were determined. *See id.*

In actual practice, BCs average only 5.5 hours (around 23%) of their shift performing exempt work. Doc. 80-3 at 21, ¶70, 23, ¶ 75. On average, the limited evaluations that BCs conduct of probationary Lieutenants amount to no more than four hours per year. Doc. 80-2 at 23, ¶ 71. Furthermore, the few BCs who help develop or review SCFD policies typically spend less than five hours per year on this task. *Id.* at 24, ¶ 73.

### Assistant Fire Chief Role

AFCs operate on a 40-hour, non-shift workweek. Doc. 80-4 at 62. AFCs do not have the same training requirements as line personnel. Doc. 80-5 at 5, 72:8-17. SCFD-issued AFC vehicles are not part of SCFD's fleet of emergency response vehicles and are not equipped with fire suppression tools. *See* Doc. 80-2 at 10, ¶ 27; Doc. 80-4 at 65. AFCs are authorized to approve vacation requests and are responsible for identifying abuse of sick leave. Doc. 80-3 at 17, ¶ 55, 19, ¶ 60; Doc.

80-8 at 37. AFCs are not dispatched to any emergency calls and have absolute discretion on whether to respond. Doc. 80-5 at 6, 117:2-4.

<u>**STANDARD OF REVIEW**</u>

This Court reviews summary judgment decisions de novo. *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1300 (11th Cir. 2016).

On review of a summary judgment decision, this Court is obligated to view "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party." *Ware*, 906 F.3d at 1311 (citing *Battle v. Bd. of Regents for the State of Ga.*, 468 F.3d 755, 759 (11th Cir. 2006)). As such, the evidence put forth by the nonmoving party must be taken at face value, and neither the district court nor this Court on review are to "undertake credibility determinations or weigh the evidence." *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010). *See*

*also Strickland v. Norfolk S. Ry.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (internal citation and quotation omitted) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."). If there are disputes regarding material facts or if reasonable minds might differ on the inferences arising from undisputed facts, summary judgment is inappropriate and the matter must proceed to trial. *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

## SUMMARY OF ARGUMENT

The district court erred by engaging in inappropriate factfinding and weighing of evidence – roles exclusively preserved for the jury – when it held that the County met its burden of showing that Appellants are exempt executives not entitled to overtime compensation under the FLSA. Doc. 101 at 26. Indeed, the district court explained that its decision was based, at least in part, on its determination that Appellants' "exempt managerial duties *greatly outweigh* any non-exempt duties they may have." *Id.* at 24 (emphasis added). This admission alone forecloses summary judgment. As such, the case should be remanded back to the district court for a trial.

Put simply, this case centers on two questions: (1) whether Appellants' primary duty is first response or management; and (2) whether Appellants recommendations as to personnel decisions are given "particular weight" as required

under 29 C.F.R § 541.100(a). Despite the district court's holding, the record is replete with evidence demonstrating that there are genuine issues of material fact in dispute as to each of these questions.

For example, with respect to Appellants' "primary duty," there are genuine issues of material fact in dispute as to the relative importance of Appellants' first response duties as compared to any exempt duties, the role and extent that Appellants play in frontline firefighting efforts, and the amount of time Appellants actually spend performing exempt duties.

Similarly, with respect to whether Appellants' recommendations as to hiring, firing, promotions or other changes in status are given "particular weight," there are genuine issues of material fact as to Appellants' role in hiring and promotional panels, whether Appellants have any independent discretion in the disciplinary process, and the weight, if any, of Appellants' recommendations on disciplinary matters.

As explained below, at the summary judgment stage, all evidence must be weighed in the light most favorable to the nonmoving party and is inappropriate if reasonable minds could differ on inferences or credibility determinations. Based on the record evidence presented in this case, there can be no doubt that genuine issues of material fact exist as to the core issues in this case. Accordingly, the district court

erred in granting summary judgment to the Appellees, and this Court should reverse and remand for a trial.

## **ARGUMENT**

The parties' dispute centers on whether Appellants are properly exempt from overtime wages under the executive exemption of the FLSA.[8] The FLSA requires covered employers to pay employees a minimum hourly wage and overtime. *See* 29 U.S.C. § 206. Generally, the FLSA requires employers to pay employees a "rate not less than one and one-half times their regular rate for hours worked in excess of forty in a workweek." 29 U.S.C. § 207(a)(1). Public employers who adopt an alternative § 7(k) work period, such as the County, are not required to pay overtime until the number of hours that the employee works in the work period exceeds the ratio of 212 hours to 28 days. 29 U.S.C. § 207(k).

BCs frequently work additional shifts beyond those that they are regularly scheduled to work, resulting in them working more than the applicable FLSA

---

[8] In its motion for summary judgment, the County, for the first time in this litigation, argued that the BCs are also exempt from overtime under the administrative exemption. *See* Doc. 61. Because the district court found that the BCs are exempt under the executive exemption, it did not reach the issue of the administrative exemption. Doc. 101 at 26, n. 17. In any event, Appellants maintain that because the County did not raise the administrative exemption defense in its Answer, *see* Doc. 21, and at no point in the ensuing sixteen months before the close of discovery did it seek to amend its Answer to assert it, the County waived this defense. *See In re Holywell Corp.*, 913 F.2d 873, 881 n. 13 (11th Cir. 1990) (A defendant waives affirmative defenses not pled).

threshold for earning overtime wages – in this case, 159 hours in a 21-day work cycle.[9] *See* Doc. 80-2 at 4, ¶ 8; Doc. 80-3 at 4, ¶ 9. Notwithstanding this fact, the County does not pay BCs overtime wages at the rate prescribed by the FLSA. To excuse its failure to properly compensate them, the County claims that BCs are exempt "executives" who are not entitled to FLSA overtime wages.

To take advantage of the FLSA's executive exemption, which is an affirmative defense, an employer bears the burden of establishing that it is entitled to an exemption. *Ramirez v. Statewide Harvesting & Hauling, LLC*, 997 F.3d 1356, 1359 (11th Cir. 2021) (citing *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 89 (2018)). Specifically, an employee meets the standard for this exemption if he or she is:

(1) compensated on a salary basis pursuant to § 541.600 at a rate of not less than $684 per week;

(2) has a primary duty in management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) customarily and regularly directs the work of two or more other employees; and

(4) has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

---

[9] The parties do not dispute that, if BCs are eligible for overtime, the applicable threshold is 159 hours, as the County has adopted a 21-day alternative work period under § 7(k). *See* Doc. 80-1 at 5.

29 C.F.R § 541.100(a); *see also Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1269 (11th Cir. 2008).

An employer's failure to prove any of these prongs by "clear and affirmative evidence" is fatal to the executive exemption defense. *Klinedinst v. Swift Invs., Inc.*, 260 F.3d 1251, 1254 (11th Cir. 2001).[10] In assessing whether an employee satisfies the executive exemption, courts must give the exemption a fair reading. *See Navarro*, 584 U.S. at 89.

## I.     THE DISTRICT COURT ERRED IN FINDING BCS ARE NOT "FIRST RESPONDERS" UNDER 29 C.F.R. § 541.3(b)

### A.     Primary Duty and the First Responder Regulation

An employee's "primary duty" is the "principal, main, major or most important duty that the employee performs," "based on all the facts in a particular case, with a major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). To determine which of an employee's duties is most important, the Department of Labor ("DOL") has put forth four factors: (1) "the relative importance of the exempt duties as compared with other types of duties;" (2) "the amount of time spent performing exempt work;" (3) "the employee's relative freedom from direct supervision;" and (4) "the relationship between the employee's

---

[10] Parties do not dispute that the Appellants satisfy prongs (1) and (3) of the executive exemption.

salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.*

Significantly, in 2004, the DOL promulgated new regulations that restrict the FLSA exemptions, and, in doing so, enacted specific provisions pertaining to the application of the executive exemption to SCFD employees. 29 C.F.R. § 541.3(b) ("First Responder Regulation").[11] In the regulation's preamble, the Secretary explained:

> The current regulations do not explicitly address the exempt status of police officers, fire fighters, paramedics or EMTs. This silence in the current regulations has resulted in significant federal court litigation to determine whether such employees meet the requirements for exemption as executive, administrative or professional employees.
>
> [T]he Department intends to make clear in these revisions to the Part 541 regulations that such . . . *first responders are entitled to overtime pay*.

69 Fed. Reg. 22,122 at 22,129 (Apr. 23, 2004) (emphasis added). The Secretary further noted that "[f]ederal courts have recognized such public safety employees do

---

[11] The Supreme Court in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) overruled the long-standing *Chevron* doctrine that permitted courts to defer to an agency's interpretation of an ambiguous statute. *See Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984); *see also* Doc. 101 at 20. But, as the district court recognized, *Auer* deference remains intact because it applies to an agency's interpretation of its own regulation, not a statute. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see also* Doc. 101 at 20 (citing *United States v. Boler*, 115 F.4th 316 (4th Cir. 2024)). Thus, Appellants agree with the district court that the pre-*Loper Bright* cases applying *Auer* deference to the DOL Secretary's interpretation of the First Responder Regulation are good law. *See* Doc. 101 at 20.

not perform 'office or non-manual work.'" *Id.* at 22,122. Thus, the First Responder

Regulation explicitly provides that:

> The Section 13(a)(1) exemptions do not apply to … fire fighters, paramedics, emergency medical technicians, ambulance personnel, rescue workers, hazardous materials workers and other similar employees, regardless of rank or pay level, who perform work such as preventing, controlling, or extinguishing fires of any type; rescuing fire, crime, or accident victims; … or other similar work.

29 C.F.R. § 541.3(b). The DOL clarified that:

> [First responders] do not qualify as exempt executive employees because their primary duty is not management of the enterprise in which the employee is employed or a customarily recognized department or subdivision thereof as required under § 541.100.
>
> ***Thus, for example, a … fire fighter whose primary duty is to … fight fires is not exempt … merely because the … fire fighter also directs the work of other employees in the conduct of … fighting a fire.***

*Id.* at (b)(2) (emphasis added). First responders also do not qualify as exempt

administrators because "their primary duty is not the performance of work directly

related to the management or general business operations of the employer." *Id.* at

(b)(3).

The Eleventh Circuit has yet to interpret and apply the First Responder

Regulation. However, other circuit courts and district courts, including courts within

this Circuit, have. *See Morrison v. County of Fairfax*, 826 F.3d 758, 767 (4th Cir.

2016); *Mullins v. City of NY*, 653 F.3d 104 (2d Cir. 2011); *Maestas v. Day & Zimmerman, LLC*, 664 F.3d 822 (10th Cir. 2012); *Emmons v. City of Chesapeake*,

982 F.3d 245 (4th Cir. 2020); *Vickery v. City of Rowell*, No. 1:22-cv-02986-VMC, 2024 BL 372789 (N.D. Ga. Aug. 9, 2024).

The Second, Fourth, and Tenth Circuits have each held that the First Responder Regulation does not replace the primary duty test. *See Mullins*, 653 F.3d at 116-17; *Morrison*, 826 F.3d at 767; *Maestas*, 664 F.3d at 827. Importantly, however, the regulation "changes the analysis in a subtle but significant way: It states that first responders are not exempt executives even if they 'also direct[] the work of other employees in the conduct of an investigation or fire.'" *Maestas,* 664 F.3d at 828-29 (quoting 29 C.F.R. § 541.3(b)(2)). Thus, "management-like tasks undertaken in conjunction with, or directly related to, primary first responder duties do not turn a first responder into an exempt executive or administrator." *Morrison*, 826 F.3d at 767 (citing *Mullins*, 653 F.3d at 115).

## B. There are Genuine Issues of Material Fact Regarding BCs' Primary Duty.

An employee's "primary duty" under the executive exemption is a question of fact. *Watkins v. City of Montgomery*, 775 F.3d 1280, 1291 (11th Cir. 2014) (citing *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709 (1986)). Because the primary duty determination is a factual one, summary judgment in favor of the County is appropriate "only if *all reasonable factfinders* would conclude that the managerial portions of [the BC]s' jobs are their 'primary duties.'" *Maestas*, 664 F.3d at 829

(emphasis added). Further, the County carries the burden of demonstrating that the BCs' primary duty is management. *Morrison*, 826 F.3d at 773.

Here, the district court held that "frontline firefighting is not the BCs' primary duty." Doc. 101 at 21-22. In so finding, the district court engaged in inappropriate factfinding and weighing of the evidence — functions reserved exclusively for a jury. Indeed, the district court explicitly noted that it reached the conclusion that BCs are not covered by the First Responder Regulation because BCs' "exempt managerial duties greatly *outweigh* any non-exempt duties they may have." Doc. 101 at 24 (emphasis added). This sentence alone is fatal to the grant of summary judgment under Rule 56 and established Eleventh Circuit precedent. *See Latimer*, 601 F.3d at 1237.

A review of the district court's decision makes plain that there are genuine issues of material fact as to whether BCs' primary duty is first response. And, by finding in favor of the County, the district court improperly weighed evidence, ignored evidence favorable to the BCs, and, in some instances, misstated the evidence of record.

1.    Importance of BCs' Emergency Response Role

In concluding that BCs' emergency response duties are outweighed by their off-scene managerial duties, the district court failed to consider the relative importance of BCs' emergency response duties. First, the district court entirely

ignored evidence that responding to calls to which they are automatically dispatched takes precedence over all of the BCs' other duties. Doc. 80-2 at 11, ¶ 28. BCs provided ample evidence that they do not have discretion to reject a call or delay their response, or to simply monitor the call by radio and continue performing administrative duties. Doc. 80-2 at 10-11, ¶¶ 28-30; Doc. 80-3 at 10, ¶¶ 27-30. Rather, when dispatched to a call, BCs must immediately cease performance of any in-station duties and respond. Doc. 80-2 at 11, ¶ 30; Doc. 80-3 at 11, ¶ 30. Indeed, Appellants cited to the deposition testimony of the SCFD's Deputy Chief, who admitted that responding to emergency calls takes precedence over BCs' other duties. *See* Doc. 83-4 at 98:12-18 (Q: "If you are in a meeting with a [BC] and a call comes in which the [BC] is automatically dispatched, is that [BC] going to leave the meeting to respond?" A: "Yes, he is required to respond to that call if that call type comes in…").

This evidence is plainly material to resolving the question of the BCs' primary duty. Upon consideration of Captains' primary duty, the Fourth Circuit in *Morrison* emphasized that:

> [w]hatever the precise importance of the Captains' non-firefighting duties — the evaluations, the disciplinary reports, the annual conforming changes to station policies — it is clear that fighting fires is the more important part of the job. When an emergency call comes in, it takes priority, and the Captains do not have discretion to decline to respond.

826 F.3d at 769.

Second, the district court mischaracterized and overstated the evidence regarding a BC's authority to cancel his response to a scene and/or leave an emergency scene. Specifically, the district court treats this authority as being unique to the BC role, stating (without citation) that

> based on information from on-scene personnel, BCs may remove themselves from a call, even one the dispatch matrix dictates they respond to. The power to leave an emergency scene without approval from a superior officer is not the type of discretion the department vests in its front-line fire fighters.

Doc. 101 at 23-24.

But this characterization of the evidence wholly disregards Appellants' evidence to the contrary. BCs provided testimony that

> the ability to downgrade a call or cancel a call does not distinguish the Battalion Chief position from other shift personnel with respect to their obligation to respond to emergencies. Indeed, Directive 107 specifically provides that SCFD units (without regard to rank) can downgrade or cancel their response to dispatched calls based on certain criteria that they typically observe when they arrive on the scene... Captains and Lieutenants (both non-exempt employees) also have the authority to cancel or downgrade a call pursuant to Directive 107, and this occurs on a regular basis across ranks.

Doc. 80-3 at 10, ¶31.

Emergency scenes are dynamic and may be more or less complex than what was initially reported. The ability of the first arriving apparatus, regardless of rank, to assess the emergency scene and downgrade or cancel a call is meaningfully different from scenarios where BCs have the discretion to remove themselves from

service for periods of time to complete management tasks. *Cf. Emmons*, 982 F.3d at 249. Here, BCs provided testimony that they cannot remove themselves from service; but rather, must stay on-call for the entirety of their 24-hour shift. *See* Doc. 80-2 at 11, ¶ 28.

Nowhere in its decision does the district court consider this evidence, and it was clearly erroneous for the district court to disregard it. *See Fikes v. Abernathy*, 793 F. App'x 913, 920 (11th Cir. 2019) (emphasizing that courts "cannot pick and choose what evidence to believe and what to reject on summary judgment"); *Heron Dev. Corp. v. Vacation Tours, Inc.*, 814 F. App'x 468, 473 (11th Cir. 2020) (district court was not "free to ignore" evidence favorable to nonmoving party on summary judgment). More importantly, there can be no dispute that the evidence presented by Appellants creates a genuine issue of material fact as to the relative importance of BCs' role in emergency response, which is critical to the primary duty analysis under the First Responder Regulation.

## 2. BCs' Frontline Firefighting Duties

Similarly, the district court ignores contrary facts in evidence related to BCs' critical role in frontline firefighting. For instance, the district court noted that BCs operate from a "fixed" position when acting as the IC. Doc. 101 at 7-8. But the district court's recitation of the facts in support of this conclusion is one-sided. The district court cherry-picked this language from the SCFD's directive on incident

command, *see* Doc. 80-8 at 7-22, which details best practices for establishing command on an incident scene. But the district court failed to consider (as BCs explained in their briefing), that the directive also provides that there are circumstances in which command must be conducted in an "offensive mode" "simultaneously with the tactical operations of the first arriving company." Doc. 80-8 at 9 (emphasis added); Doc. 80-2 at 12, ¶ 33; Doc. 80-3 at 11, ¶ 33. To this same end, several BCs provided testimony that, in actual practice, BCs are trained and required to engage in a tactical, non-fixed position as the IC if the scale and complexity of the incident necessitates it. *See* Doc. 80-9 at 4, 9:5-12 (explaining that even in the role of IC, BCs must engage in frontline firefighting where necessary to mitigate emergency incident); Doc. 80-12 at 3, 11:15-19 (same).

The district court also erroneously concluded that "BCs rarely, if ever, fight fires or engage in hands-on emergency response and never do as IC." Doc. 101 at 23. But the record is replete with evidence to the contrary. BC Hogue testified that he serves as ISO more often than as IC, and that as ISO, he "go[es] into quite a bit of frontline firefighting situations." Doc. 80-15 at 3, 11:6. BC Garcia provided similar testimony that when serving as ISO, he "often times" enters a burning structure, Doc. 80-17 at 3, 13:13-15, as did BC Mattera. Doc. 80-11 at 4 ¶13 ("As an ISO, I am required to don full PPE and am often in or near IDLH environments. In fact, I *often* have to enter into burning structures.") (emphasis added).

Further, the district court's determination that BCs "never" engage in hands-on emergency response when in the IC role is also flawed, as the court failed to consider the record as a whole — and in some cases wholly disregarding the evidence cited by BCs. In support of its conclusion that "BCs do not engage in frontline firefighting while in command," the district court cites the deposition testimony of BCs Norman, Snyder, and Taylor as support. Doc. 101 at 8. Once again, however, the evidence cited by the district court is one-sided.[12] While these particular BCs may not have had occasion to engage in frontline firefighting in the IC role, other BCs testified that they have. In fact, BC Mattera testified, with photographic evidence in support, regarding an emergency incident in which he served as IC and was required to don PPE, as the conditions on the ground required him to operate in a "forward-facing position...within a few feet of the burning structure." Doc. 80-11 at 4, ¶¶ 8-10. In view of this evidence (which the court failed to consider), it was error for the court to characterize the IC role as categorically precluding frontline firefighting. *See Fikes*, 793 F. App'x at 920; *Heron Dev. Corp.*, 814 F. App'x at 473.

---

[12] It is also worth noting that the district court mischaracterized the deposition testimony of BC Snyder. Snyder testified that when responding to fires in high-rise buildings, as IC, he sets up command inside the lobby of the burning building and dons full protective gear. (Snyder depo. 11:13-25).

Moreover, the district court misapprehended the fundamental nature of firefighting. As Appellants testified, emergency incidents are dynamic and unpredictable. *See, e.g.*, Doc. 80-17 at 3, 14:3-7 ("[Y]ou have to understand incident scenes are very dynamic, they're hazardous places."). While a situation requiring a given IC (of any rank) to engage in frontline firefighting may never come to pass, the IC is nonetheless trained for and expected to engage in frontline firefighting should such a situation arise. *See* Doc. 80-3 at 11, ¶ 33 (IC "must be prepared to participate in fire suppression and rescue duties like all other shift personnel"). As such, it was error for the district court to conclude that BCs do not engage in frontline firefighting.

3.     Time Spent on Exempt Activities

Finally, in concluding that first response is not BCs' primary duty, the district court failed to consider evidence regarding the limited amount of time spent by BCs performing exempt duties – evidence which is directly relevant to the court's analysis under 29 C.F.R. 541.700(a). First responder work is undoubtedly unique. "[T]he nature of the job of every front-line fire fighter[] is generally to wait. Any given day for a fire fighter may consist of extended periods of boredom, punctuated by periods of urgency and moments of terror." *Barrows v. City of Chattanooga*, 944 F. Supp. 2d 596, 604-05 (E.D. Tenn. 2013). As such, the primary duty analysis under the first responder regulation is not based on the amount of time spent fighting fires,

but the amount of time performing exempt work. 29 C.F.R. § 541.700(a). The Eleventh Circuit has noted that how long an employee spends performing exempt tasks, although a relevant factor, "is not dispositive of the primary duty issue." *Morgan*, 551 F.3d at 1270; *see also* 29 C.F.R. § 541.700(a). Further,

> [t]he burden is on the County to come forward with evidence that the [BCs] spend some significant portion of their time at the station — the regulations suggest that 'employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement,' — on managerial or management-related tasks.

*Morrison*, 826 F.3d at 770 (internal citations omitted).

The district court took pains to detail the County's job description and its estimation of the percentage of time BCs spend performing their respective duties. *See* Doc. 101 at 5-6. Ironically, however, despite recognizing that "no one at SCFD assessed the percentage breakdown to ensure its accuracy," the district court did not consider the sworn testimony that BCs' administrative duties amounted to only a small portion of their 24-hour shift. Doc. 80-2 at 17, ¶ 50; Doc. 80-3 at 16, ¶ 51. Indeed, BC Garcia testified that on average, BCs spend only 5.5 hours (around 23%) of their shift performing exempt work. *See* Doc. 80-3 at 21, 23, ¶¶ 70, 75.

The evidence ignored by the district court plainly disputes the County's accounting of the time BCs spend on exempt work – and this evidence is unquestionably material. *See Morrison* 826 F.3d at 770-71 (finding limited time spent on exempt activities to be relevant to the primary duty analysis); *see also*

*Barrows*, 944 F. Supp. 2d at 604 (noting managerial duties performed by Plaintiff took up only 20 to 30% of each day). Thus, the district court committed reversible error by failing to consider this evidence.

In short, on these facts, a reasonable jury could find that a BCs' primary duty is first response, and that the First Responder Regulation therefore applies to the BCs. Thus, the district court's finding to the contrary was error, and this Court should reverse the ruling below.

## II. THE DISTRICT COURT ERRED IN FINDING BATTALION CHIEFS' ON-SCENE MANAGEMENT AND OFF-SCENE DUTIES DO NOT FALL UNDER 29 C.F.R. § 541.3(b)

In support of its conclusion that BCs are managerial staff, the district court finds BC's primary job duty is on-scene emergency management and management of their battalion. Doc. 101 at 23 ("The bottom line is that a BC fills a managerial role while performing both his in-station duties and his on-scene emergency response."). In taking this view, the district court narrowly defines first response work to fire fighters who pull hose or climb ladders and broadly defines exempt management tasks as all managerial duties. This interpretation, however, conflicts with the regulation and caselaw applying the First Responder Regulation. *See* 29 C.F.R. § 541.3(b)(2); *Morrison*, 826 F.3d at 767; *see also Barrows*, 944 F. Supp. 2d at 604 (rejecting argument that plaintiff was exempt because his primary duty on scene was to "manage his team").

## A. On-Scene Management

In finding that BCs' "on-scene duties do not fall under the First Responder Regulation," the district court relied exclusively on one of many roles BCs may possess when responding to an emergency incident – that of the IC – which it frames as a high-level strategic role entirely divorced from actual first response work. Doc. 101 at 23. Specifically, the district court found that BCs "most typically oversee incidents as IC, supervising and directing personnel, strategizing, and allocating equipment and resources to resolve the emergency, oftentimes from their command post SUV." *Id*. And, based on this understanding of the IC role, the district court held that BCs' "primary responsibility is to develop an emergency response plan," which it deemed to be a managerial task that falls outside the regulation. *Id*. (quoting *Emmons*, 982.F.3d at 252.). Such on-scene tasks, however, are precisely the type of "management" activity excluded under the regulations.

As explained above, the regulation provides that a "fire fighter whose primary duty is to… fight fires is not [an exempt executive] merely because the … fire fighter also directs the work of other employees in the conduct of … fighting a fire." 29 C.F.R. § 541.3(b)(2). In *Morrison*, the Fourth Circuit explained that:

> to the extent such management or direction takes the form of supervision, particularly supervision related to first response - 'apportioning work' among subordinates, 'determining the techniques and personnel to be used' in connection with first response, 'reallocating [subordinates'] activities,' and the like - ***it is not exempt "management" activity under the regulatory framework here***.

*Morrison* 826, F.3d at 771 n.8 quoting *Mullins*, 653 F.3d at 118 (emphasis added). The *Morrison* court further noted, "even read narrowly, the example provided in subsection (a)(2) of the first responder regulation precludes [the court] from classifying as 'management' the supervision of employees in the course of activities directly related to first response duties." *Id.* at 771. Despite the district court's conclusion, the IC role unquestionably involves supervision directly related to first response duties. *Id.*

To start, as explained in detail above, there are genuine issues of material fact in dispute with respect to the whether BCs "most typically" act as IC and whether they engage in front-line firefighting when acting in the IC role. Nevertheless, even ignoring these disputed facts, the district court's narrow characterization of the IC role understates the duties and importance of the IC position in fire suppression.

The IC role is not exclusively reserved for BCs nor is it deployed only on complex scenes requiring BC "leadership expertise." Doc. 101 at 23. In fact, pursuant to County policy, incident command "shall be established on **ALL** incidents" and is assumed by "[t]he ranking member of the first arriving company." Doc. 80-8 at 8 (emphasis in original). This means that incident command is established regardless of whether a BC is automatically dispatched to the scene. Further, as contemplated by the County's directives and confirmed by testimony provided by BCs, depending on the circumstances, Captains or Lieutenants regularly

retain the IC role for the entirety of the incident even when one or more BCs are also on-scene. *Id.* at 9; *see also* Doc. 80-2 at 12-13, ¶¶ 34-35; Doc. 80-3 at 11-12, ¶¶ 34-35.

Notwithstanding their role as IC, Captains and Lieutenants are rightfully classified as first responders by the County. That is because, on a fire scene, regardless of rank, the duties of the IC remain the same and are integrally tied to tactical operations and first response duties. In particular, the IC is responsible for apportioning work among subordinates such as assigning individuals to divisions or groups to "perform tactical functions in a specified geographical area (such as on a specified floor or side of a structure)." Doc. 80-8 at 10. The IC is also responsible for determining the techniques and personnel necessary for achieving tactical objectives like rescuing endangered individuals, ventilation, and/or extinguishment. *Id*. at 16. Finally, the IC must "ensure firefighter safety" and reallocate the activities of subordinates depending on the constant evaluation and re-evaluation of scene complexity and conditions. *Id*.

This type of on-scene supervision cannot be separated from first response duties, nor should they be considered high-level development of emergency response plans outside the purview of the First Responder Regulation. *See Morrison,* 826, F.3d at 771 n.8; *Mullins*, 653 F.3d at 120; *Vickery*, 2024 BL 372789, at *8 (finding role as incident commander on an emergency scene, which required the

Battalion Chief "assess[] the dangers faced by those on the scene and supervis[e] the first responders around him to respond appropriately," to be non-exempt work under First Responder Regulation). Accordingly, the district court erred in holding BCs' on-scene supervision and direction of crew members to be managerial tasks that fall outside the First Responder Regulation.

### B. Off-Scene Management

To this same end, managerial duties related directly to first response, even when they do not take place on-scene, are not considered exempt activities under the regulations. *See Barrows*, 944 F. Supp. 2d at 604. While recognizing this principal, the district court noted that "off-scene tasks so far removed from any front-line firefighting are not non-managerial just because they relate tangentially to the business of hands-on firefighting," and held that "Plaintiffs perform many critical off-scene management tasks disconnected from direct first response activity." Doc. 101 at 22. In support of this finding the district court relies, at least in part, on BCs' role in training, making station rounds, reporting broken equipment, and filling out injury and accident reports. *Id.* at 11-12, 22. These tasks, however, have been held to be non-exempt tasks under the First Responder Regulation.

For example, in *Morrison*, the Fourth Circuit determined that time spent on training and "other efforts to 'assur[e] a constant state of preparedness,'" to relate directly to regular front line firefighting duties. *Morrison*, 826 F. 3d at 771 (quoting

*Barrows*, 944 F. Supp. 2d at 604). To that same end, the court in *Barrows* found that management duties such as "conducting training sessions, performing building walk-throughs, and assuring a constant state of preparedness" are not exempt activities under the First Responder Regulation because they related directly to frontline firefighting duties. *Id.* (citing *Mullins*, 653 F.3d at 116).

Finally, the scope of off-scene duties related directly to first response was recently addressed by a district court within this circuit in *Vickery*. *See generally*, *Vickery*, No. 1:22-cv-02986-VMC, 2024 BL 372789 (N.D. Ga. Aug. 09, 2024). In *Vickery*, in addition to responding to emergency incidents, an essential aspect of plaintiff's job as a battalion chief was managing his battalion. *Id.*, at *2. The court recognized that this role required plaintiff to travel between stations to ensure a constant state of preparedness and was, therefore, non-exempt first response work. *Id.*

As recognized by the district court. like the fire fighters in the cases cited above, BCs in this case spent much of their off-scene time engaging in training and other activities related to maintaining a constant state of preparedness, such as traveling from station-to-station, inspecting equipment, and filling out incident and accident reports. Doc. 101 at 22. As such, the district court erred in finding that such duties constitute exempt work. Instead, these duties are directly related to first

response and does not remove them from entitlement to overtime under the First Responder Regulation.

## III. THE DISTRICT COURT ERRED IN FINDING BATTALION CHIEFS ARE EXEMPT "EXECUTIVE" EMPLOYEES UNDER 29 C.F.R. § 541.100

In addition to its flawed application of the First Responder Regulation, the court below separately erred in finding Battalion Chiefs are exempt "executive" employees under 29 C.F.R. § 541.100. Specifically, the district court determined that Battalion Chiefs satisfy the fourth prong of the executive exemption test – authority to hire and fire -and thus the County was entitled to summary judgment. In doing so, however, the district court ignored facts favorable to Appellants' position, and in some instances misstated the evidence of record.

As explained above, for the executive exemption to apply, the County was required to prove by "clear and affirmative evidence" each of the four-prong test set forth in 29 C.F.R. § 541.100; failure to prove even one element is fatal. *Klinedinst*, 260 F.3d at 1254. Under the fourth prong of the test, the County was required to prove that Battalion Chiefs, have "the authority to hire or fire other employees or [are those] whose suggestions or recommendations and recommendations as to hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(4). Here, there is no dispute that BCs lack independent authority to hire or fire. Doc.

101 at 12. Thus, the critical question is whether BC's recommendations are given "particular weight."

The FLSA's implementing regulations provide that, to determine whether an employee's suggestions and recommendations are given "particular weight":

> factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker.

29 C.F.R. § 541.105.

In support of its finding that Battalion Chiefs possesses the requisite authority to hire/fire, the district court relied on the following facts, which it concluded were undisputed: (1) BCs participate in hiring panels; (2) BC evaluate first-year lieutenants; and (3) BCs issue and review verbal reprimands and make recommendations on written reprimands." Doc. 101 at 25-26. The record, however, is replete with evidence disputing the very facts the district court relied upon. While the district court may have, for one reason or another, chosen to lend greater credence to the County's version of the facts, it was not within its purview to do so. Such credibility determinations are a quintessential function of the jury. *See Strickland*, 692 F.3d at 1154. Each relevant fact relied upon by the district court is addressed in turn below.

41

### A. Hiring Panels

First, the district court appears to place significant weight on its determination that BCs engage in an increased role in the hiring process. In particular, the district court contends that it is an undisputed fact that BCs participate in hiring panels "more often" than other ranks and "their recommendations are given particular weight." Doc. 101 at 26. This finding directly conflicts with testimony from several BCs and ignores the fact that participation on hiring panels is not part of BCs regular job duties.

As an initial matter, the district court fails to cite to any record evidence in support of its finding that BCs participate on hiring panels "more often" than other ranks. Indeed, some BCs have never participated in hiring panels. *See* Doc. 68 at 28, 26:8-11 ("Q: have you ever served as an assessor for a new employee hiring process? A: No."). Moreover, BCs provided testimony that their role in the hiring panel process is no different than any other rank which participate. Doc. 80-2 at 23, ¶ 70 ("panels are generally comprised of other fire fighters, including Lieutenants and Captains."); Doc. 80-3 at 22, ¶ 71 (same). Specifically, multiple BCs provided testimony that panel is required to "ask a list of pre-determined questions and does not have the authority to deviate from the questions crafted by the County." Doc. 80-2 at 23, ¶ 70; Doc. 80-3 at 22, ¶ 71.

Further, BCs testified that all scores are aggregated, such that those with hiring authority have no way of differentiating a BC's recommendation from that of any other panelist. *Id*. This is directly contrary to the evidence relied upon by the district court that BC recommendations receive "much greater emphasis." Doc. 101 at 12. BCs also testified that the "hiring and/or promotional panel recommendations are given little weight" and that there have been "numerous instances in which the County has ignored the recommendations" of the hiring panel. Doc. 80-2 at 23, ¶ 70; Doc. 80-3 at 22, ¶ 71. Finally, BCs provided testimony that participation in hiring panels is "voluntary," "never done on duty time," and is not part of BCs "actual job duties." Doc. 80-2 at 23, ¶ 70; Doc. 80-3 at 22, ¶ 71. This is significantly different from the facts in the cases relied upon by the County and district court. *See Emmons*, 982 F.3d at 257 (finding "the hiring panel process is structured in a way that strongly suggests the particular weight of BCs' recommendations" where numerical scores submitted by the panel were not aggregated, BCs could spontaneously recommend captains for an acting BC position, and recommendations for promotion were never rejected.).

## B. Evaluations

The district court also asserts that BCs "mentor and evaluate first-year lieutenants. At the end of the first year, BCs offer a hiring recommendation up the chain of command." Doc. 101 at 26. In support of its conclusion, the district court

fails to cite to any record evidence for this proposition nor have Appellants been able to identify any evidence supporting the assertion that BCs "offer hiring recommendations [for probationary Lieutenants] up the chain of command." Probationary Lieutenants have already been hired/promoted at the time BCs perform their evaluations. *See* Doc. 75 at 31, 29:11-16. Nevertheless, BCs provided testimony that BCs have "very little" responsibility with respect to evaluating employees. Doc. 80-2 at 23, ¶ 71; Doc. 80-3 at 22, ¶ 72. They only evaluate probationary Lieutenants, and the evaluation process consists of filling out a standardized probationary form and sending it up the chain of command. *See* Doc. 74 at 27, 24:11-20.

Additionally, the district court ignored the evidence submitted by BCs that non-exempt Lieutenants actually have a much greater role in the evaluation of probationary employees. Specifically, that "Lieutenants are required to perform daily evaluations of all probationary fire fighters under their chain of command." Doc. 80-3 at 22, ¶ 72; Doc. 80-2 at 23, ¶ 71. Lieutenants' role in the evaluation process does make them exempt executives. This is because Lieutenants, like BCs, do not have discretion with respect to whether a probationary employee completes their probationary period nor are their recommendations given "particular weight." In fact, as agreed to by the parties in the stipulated facts submitted during the unit

petition, BCs do not "evaluate subordinates in a manner which may adversely affect any term or condition of employment." Doc. 83-11.

### C. Disciplinary Process

Finally, the district court relied on BCs' alleged role in the disciplinary and grievance process in its determination that BCs have necessary authority under the hire/fire prong of the executive exemption. Specifically, the district court contends that BCs "issue verbal reprimands to subordinates and document these reprimands on official forms placed in the employee's personnel file. Plaintiffs can recommend a written reprimand and investigate grievances. Plaintiffs sign off on subordinate officers' verbal reprimands of rank-and-file fire fighters." Doc. 101 at 25.

Again, the facts relied upon by the district court are disputed. First, BCs' role in the disciplinary process is limited requires no greater discretion than that of Captains or Lieutenants. BCs provided testimony that the only discipline they, like Captains and Lieutenants, can issue is a Form 103 counseling, which is reserved for minor infractions like tardiness. Doc. 80-3 at 22-23, ¶ 73; Doc. 80-2 at 24, ¶ 72. The fact that BCs were required to prepare "standard documentation in response to mundane and objective infractions" does not equate to discretionary authority required by the executive exemption. *See Vickery,* No. 1:22-cv-02986 VMC, 2024 BL 372789, at *9.

Second, signing off on Form 103s prepared by lower ranks does not transform BCs into exempt executives. As recognized by the County, the fire department is a paramilitary operation. This means that it follows a strict hierarchical command structure of which BCs are just another step of review in the chain of command. Captains sign-off on Lieutenants and BCs sign off on Captains. None of these ranks, however, have independent authority in the disciplinary process. *See* Doc. 69 at 17, 15:3-11 (stating "if I give a 103, it gets sent up to my superior…"). All actual personnel decisions are made by higher ranks.

Third, what role, if any, BCs have in making recommendations on discipline and the grievance process is also disputed. The district court cites testimony provided by District Chief Hartley who states that BCs "might be called upon to gather information, give reports, to do an evaluation, make a recommendation as to whether the employee should be, at times, terminated." Doc. 101-12. BCs assert the opposite – "BCs do not provide recommendations on firing other bargaining unit members, or any other employees." Doc. 80-2 at 24, ¶ 72; Doc. 80-3 at 22, ¶ 73 . Likewise, the district court contends that BCs can make "recommendations on written reprimands." Doc. 101 at 25. Multiple BCs, however, provided testimony that they have no ability to provide such recommendations related to written reprimands. *See* Doc. 69 at 17, 15:3-11 (stating BCs cannot recommend written reprimands.); Doc. 74 at 23, 21:1-4 (same); Doc. 75 at 26, 24:5-12 (same).

Finally, even if BCs do on occasion give recommendations related to discipline, such recommendations are not part of the BCs actual job duties. Rather, consultation, if done at all, is best described as ad hoc. Doc. 75 at 25, 23:19-24:12 (explaining that, at most, BCs are asked, if they have knowledge) to provide a recitation of facts surrounding an incident like any other station (or acting station) officer). The regulations make clear that "occasional suggestion[s] with regard to the change in status of a co-worker" are insufficient. 29 C.F.R. § 541.105.

The critical facts highlighted above as to hiring, evaluations, and discipline were disregarded by the district court and unquestionably create a genuine issue of material fact as to whether BCs' suggestions and recommendations are given "particular weight." Accordingly, the district court erred in finding that the County met its burden to prove the requirements of the executive exemption.

## CONCLUSION

For the foregoing reasons, this Court should reverse the ruling of the lower court granting summary judgment in favor of the Appellee and remand for trial.

Respectfully Submitted,

*/s/ Tamara Imam*
Tamara Imam
MOONEY GREEN SAINDON MURPHY & WELCH
1920 L Street NW, Suite 400
Washington, DC 20036
 (202) 783-0010
*Counsel for Plaintiffs/Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) as the brief contains 11,436 words, excluding those parts exempted by 11th Cir. Local R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) as this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

*/s/ Tamara Imam*
Tamara Imam

# CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2024, a copy of the brief was served on all counsel of record via CM/ECF.

*/s/ Tamara Imam*
Tamara Imam
MOONEY GREEN SAINDON MURPHY & WELCH, P.C.
1920 L Street NW, Suite 400
Washington, DC 20036
(202) 783-0010
*Counsel for Plaintiffs/Appellants*