# 24-13466-D

# United States Court of Appeals
*for the*
# Eleventh Circuit

MICHAEL SULLIVAN, WILLIAM SCHREINER, TRAVIS DAGENAIS,
BRETT TAYLOR, JOHN HOGUE, et al.,

*Plaintiffs/Appellants,*

– v. –

SARASOTA COUNTY, FL,

*Defendant/Appellee.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
CASE NO: 8:22-cv-01605-SPF
(Hon. Sean P. Flynn)

## REPLY BRIEF OF APPELLANTS

TAMARA IMAM
LAUREN P. MCDERMOTT
MOONEY, GREEN, SAINDON, MURPHY &
WELCH, P.C.
1620 Eye Street NW, Suite 700
Washington, DC 20006
(202) 783-0010

*Counsel for Plaintiffs/Appellants*

CP COUNSEL PRESS    (800) 4-APPEAL •

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 and 28-1(b), Appellants respectfully submit a complete list of all persons and entities known to have an interest in the outcome of this appeal:

1. Egan, Lev & Siwica, PA
2. Flynn, Sean P., United States Magistrate Judge, Middle District of Florida
3. Hackman Parker, LLC
4. International Association of Fire Fighters (IAFF)
5. Imam, Tamara, Counsel for Plaintiffs/Appellants
6. Leff, Peter, General Counsel to the IAFF
7. McDermott, Lauren, Counsel for Plaintiffs/Appellants
8. Mooney, Green, Saindon, Murphy & Welch, P.C.
9. Murphy, Mark, Counsel for Plaintiffs/Appellants
10. Parker, Heidi, Counsel for Plaintiffs
11. Siwica, Richard, Counsel for Plaintiffs

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

/s/Tamara Y. Imam
Tamara Y. Imam

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... ii

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ...............................................................C-1

ARGUMENT ...........................................................................................1

    I.     The County Misstates the Standard to be Applied to the
           Executive Exemption ..............................................................1

    II.    Many of the Facts the County Claims Are "Undisputed" Are
           Indeed in Dispute....................................................................3

          A.    Primary Duty Prong .......................................................3

                1.    On-Scene Duties ..................................................4

                2.    In-Station Administrative Duties.....................8

          B.    Hiring/Firing Prong......................................................10

    III.   The County Reads the First Responder Regulation Too
           Narrowly................................................................................12

CONCLUSION .......................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Barrows v. City of Chattanooga*,
944 F. Supp. 2d 596 (E.D. Tenn. 2013) ................................................. 6, 7, 14, 15

*Brown v. Nexus Bus. Solutions, LLC*,
29 F.4th 1315 (11th Cir. 2022)....................................................................2

*Emmons v. City of Chesapeake*,
982 F.3d 245 (4th Cir. 2020)....................................................... 2, 8, 10

*Encino Motorcars, LLC v. Navarro*,
584 U.S. 79 (2018) .................................................................................1

*Helix Energy Solutions Group, Inc. v. Hewitt*,
143 S. Ct. 677 (2023) ...........................................................................2

*Klinedinst v. Swift Invs., Inc.*,
260 F.3d 1251 (11th Cir. 2001)...............................................................2

*Maestas v. Day & Zimmerman, LLC*,
664 F.3d 822 (10th Cir. 2012)................................................................13

*Morgan v. Family Dollar Stores, Inc.*,
551 F.3d 1233 (11th Cir. 2008)............................................................2, 3

*Morrison v. County of Fairfax*,
826 F.3d 758 (4th Cir. 2016)...................................................... 6, 13, 15

*Mullins v. City of New York*,
653 F.3d 104 (2d Cir. 2011)..................................................... 13, 14

*Rodriguez v. Farm Stores Grocery, Inc.*,
518 F.3d 1259 (11th Cir. 2008).............................................................3

*Vickery v. City of Roswell*,
No. 1:22-cv-02986-VMC, 2024 BL 372789
(N.D. Ga. Aug. 9, 2024) .......................................................... 9, 14, 15

**Statutes & Other Authorities:**

29 C.F.R. § 541.100(a) ................................................................2

29 C.F.R. § 541.3(b) ...............................................................12

29 C.F.R. § 541.3(b)(2) .................................................. 13, 14

29 C.F.R. § 541.700(a) .............................................................6

FPERC Decision, Sarasota-Manatee Professional Firefighters and Paramedics, Local 2546, IAFF, No. UC-99-040 (Jan. 18, 2000) ...........................................12

## ARGUMENT

**I.     The County Misstates the Standard to be Applied to the Executive Exemption.**

At the outset, the County misstates the applicable standard for assessing an employer's entitlement to the executive exemption. The County asserts that "it is not necessary to fully satisfy" all four prongs of the executive exemption under the "fair reading" standard espoused by *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79 (2018), and that, rather, the analysis is a "holistic one." *See* Brief of Appellee at 19, 26. But this assertion is categorically false. The regulations are clear that, to take advantage of the executive exemption, an employer must demonstrate that the employee satisfies each of the following four criteria:

1) the employee is compensated on a salary basis at not less than the level set forth in § 541.600;

2) the employee's primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

3) the employee customarily and regularly directs the work of two or more other employees; **and**

4) the employee has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a) (emphasis added).[1]

In keeping with the plain language of the regulation, Eleventh Circuit case law leaves no doubt that an employer must satisfy – by "clear and affirmative evidence" – all four prongs to claim the benefit of the executive exemption. *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1266 (11th Cir. 2008); *Klinedinst v. Swift Invs., Inc.*, 260 F.3d 1251, 1254 (11th Cir. 2001). And each of the cases cited by the County in support of its claim to the contrary is inapposite. While these cases stand for the proposition that the analysis of an employee's *primary duty* – just one of the four prongs of the executive exemption – is a holistic one, none state that an employer need not prove each element of an FLSA exemption to avoid overtime liability. *See generally Emmons v. City of Chesapeake*, 982 F.3d 245, 252 (4th Cir. 2020); *Brown v. Nexus Bus. Solutions, LLC*, 29 F.4th 1315 (11th Cir. 2022); *Helix Energy Solutions Group, Inc. v. Hewitt*, 143 S. Ct. 677, 682 (2023).

Rather, the regulations and the case law are clear: an employer's failure to satisfy even one of the prongs of the executive exemption is fatal to the defense, and the employer will be liable for overtime.

---

[1] As noted in Appellant's Opening Brief, the Battalion Chiefs do not dispute that they satisfy prongs (1) and (3) of the executive exemption.

**II.     Many of the Facts the County Claims Are "Undisputed" Are Indeed in Dispute.**

### A. Primary Duty Prong

The County first asserts that the undisputed facts demonstrate that the Battalion Chiefs' ("BCs") primary duty is management. However, the facts relied on by the County are far from undisputed, and the question of the BCs' primary duty must therefore be reserved for the factfinder.

Critically, as this Circuit has recognized, the question of what constitutes an employee's "primary duty" under the executive exemption is a "necessarily fact-intensive" inquiry. *Morgan*, 551 F.3d at 1269. Accordingly, the answer to this inquiry "'is in the details,'" such that "'it is not unusual for there to be evidence on both sides of the question, with the result hanging in the balance.'" *Id.* (quoting *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1263 (11th Cir. 2008)).

Such is the case here. In arguing that the BCs' primary duty is indisputably managerial, the County mischaracterizes their role on an incident scene and fails to contend with the ministerial nature of the BCs' in-station duties —the very kinds of "details" precluding summary judgment on the primary duty question.

1. <u>On-Scene Duties</u>

The crux of the County's argument with respect to the BCs' on-scene duties is that BCs do not, except in rare circumstances, engage in frontline firefighting. But this argument both ignores the BCs' other roles on the scene of an incident and misapprehends the nature of firefighting.

The County focuses almost entirely on the BCs' role as Incident Commander ("IC"), asserting that in this role, the BCs are to maintain a fixed position outside the incident and are not dispatched to go inside structures. However, despite the County's contentions, these alleged facts are in dispute. Several BCs testified that they are trained and required to engage in a tactical, non-fixed position as the IC as dictated by the nature of the emergency incident.[2] *See* Doc. 80-9 at 4, 9:5-12; Doc. 80-12 at 3, 11:15-19; Doc. 80-11 at 3, ¶¶6-7, 4 ¶¶8-10.

Indeed, the Sarasota County Fire Department ("SCFD")'s own directive on incident command provides that the IC may be required to conduct incident command "simultaneously with the tactical operations" on scene depending on the circumstances. Doc. 80-8 at 9 ("If there is a need for immediate tactical activity including the Company Officer, command in the offensive mode should be initiated."). In just one example of this principle, Battalion Chief Snyder stated that

---

[2] Further, as noted in the proceedings below and in Appellants' Opening Brief, lower-ranked, non-exempt fire fighters can and do serve in the IC role as well.

when responding to fires in high-rise buildings and acting as an IC, he establishes incident command inside the lobby of the burning building and dons full protective gear. Doc. 68 at 13, 11:13-25. Thus, the County's characterization of the IC role as necessarily precluding frontline firefighting work is directly disputed by the record evidence. The IC role, like firefighting as a whole, is dictated by the unpredictable and dynamic nature of emergency incidents.

More fundamentally, though, the County largely fails to acknowledge that IC is not the only role BCs play on the scene of an incident. BCs serve in a number of other roles, including Incident Safety Officer ("ISO") and as part of the Initial Rapid Intervention Crew ("IRIC"). While the County boldly asserts that the "second-arriving battalion chief also rarely, if ever, enters a structure," Brief of Appellee at 9, several BCs offered their first-hand experience that these roles often involve frontline firefighting. *See, e.g.*, Doc. 64 at 11, 9:11-22 (explaining that BCs on scene not acting as IC are "actively firefighting"); Doc. 80-15, at 3, 11:3-14 ("[W]hen I get [to the scene], my role is generally as a safety officer and not incident command... So I do go in quite a bit to front line firefighting situations, quite often, actually… Just as any other firefighter, I have my protection on and I go in and do frontline firefighting situations."); Doc. 80-9 at 3, 6:14-17 ("[I]f I'm not the first on the call, I might be the safety officer, where I put on my full gear, SCBA, and be part of the incident."). *See also* Docs. 80-11, 80-13, 80-14.

Further, even assuming arguendo that the County's characterization of BCs' frontline firefighting activities as "isolated" and "rare" were accurate, the County's argument fundamentally misunderstands both the law and the nature of firefighting. Recognizing the unpredictability of emergency incidents and that first responder work inherently involves sitting (or sleeping) and waiting for an emergency call, courts have found that the amount of time spent fighting fires is largely irrelevant to the analysis. As one district court aptly explained:

> The fact that Plaintiff's direct firefighting duties did not constitute the largest percentage of his time does not detract in any way from the fact that Plaintiff's primary duty was as a firefighter. The nature of Plaintiff's job, as is the nature of the job of every front-line fire fighter, is generally to wait. Any given day for a fire fighter may consist of extended periods of boredom, punctuated by periods of urgency and moments of terror.

*Barrows v. City of Chattanooga*, 944 F. Supp. 2d 596, 604-05 (E.D. Tenn. 2013). *See also Morrison v. County of Fairfax*, 826 F.3d 758, 770 (4th Cir. 2016) (finding it "illogical" to give much weight to time spent responding to calls); 29 C.F.R. § 541.700(a) (including amount of time performing *exempt* rather than *non-exempt* work as one of the factors to consider when determining an employee's primary duty).

The operative question is therefore not how much time BCs spend performing firefighting duties, but whether their firefighting duties are the ***most important*** duties they perform. *See Morrison*, 826 F.3d at 769 (rejecting argument that plaintiffs'

primary duty was not first response because they "spend very little of their work time actually responding to emergency calls"); *Barrows*, 944 F. Supp. 2d at 605. Here, the record contains ample evidence from which a reasonable factfinder could conclude that the BCs' firefighting duties are their most important. *See, e.g.*, Doc. 80-3 at 23-24, ¶76 (explaining that BCs must immediately cease administrative duties and respond to calls when dispatched); Doc. 83-4 at 4, 98:12-18 (same); Doc. 80-4 at 85-87 (including BCs in minimum staffing); *Id.* at 65 (including BC vehicle among "emergency vehicles for fire suppression").

Thus, the County's contentions that firefighting cannot be BCs' primary duty because they purportedly spend "less than 5 percent of their on-duty time responding to or being on scene for any incident," Brief of Appellee at 37, are simply irrelevant. *See, e.g.*, *Barrows*, 944 F. Supp. 2d at 605 ("[A]lthough [the captain's] firefighting duties may not have been his most time-consuming, they were clearly the most important duties that he performed."). While the occurrence of emergency incidents that necessitate a BC's response (or that of any firefighter) may be relatively few in number compared to their overall time prepared to engage, it is clear that BCs (like other members of the bargaining unit) are a vital part of the emergency response when these incidents do occur – and they must be prepared to engage in all levels of response. *See* Doc. 79 at 17, 15:18-24 ("[O]ur job is to be ready for anything… So, I expect to go on a call, and there be people that need to be rescued, fire that needs

to be put out, I have to prepare for the highest level of risk because that's the expectant risk."); Doc. 68 at 14, 12:7-22 (explaining that on an incident scene, "everything is dynamic," and therefore, as appropriate, a BC acting in the IC role will enter into the burning structure and make rescues); *Id.* at 15, 13:3-7 ("[B]ased on the situation there could be a time where we may have to handle a hose line in order to get the operations complete.").

### 2. In-Station Administrative Duties

The County also relies on the BCs' in-station duties, arguing that the performance of these duties demonstrates that BCs are primarily managers. But, despite its assertions to the contrary, the County's characterization of these duties is strongly disputed, as demonstrated by the ample record evidence relied on by Appellants.

While the BCs undoubtedly perform administrative duties, these duties are largely ministerial in nature. As it pertains to staffing, scheduling, and payroll, the BCs' duties are constrained by SCFD policy, almost entirely automated, and often also performed by lower-ranked, non-exempt officers. Doc. 80-3 at 16-21, ¶¶51-68. Thus, in contrast to *Emmons* – which the County contends is analogous to this case – the exercise of BCs' administrative duties does not involve the "discretion and independent judgment" characteristic of exempt executives.

The extent of the BCs' role in disciplinary matters is also in dispute. The County relies heavily on the BCs' alleged authority to dole out discipline of their subordinates in support of its claim that they are primarily managers. However, the highest level of discipline a BC is authorized to issue is a documented oral reprimand, known as a Form 103 counseling, which is limited to minor infractions such as tardiness and may also be issued by the non-exempt Captains and Lieutenants. Doc. 80-3 at 22-23, ¶ 73; Doc. 80-2 at 24, ¶ 72.[3] Such limited disciplinary authority is not of the type characteristic of exempt managers. *See, e.g.*, *Vickery v. City of Roswell*, No. 1:22-cv-02986-VMC, 2024 BL 372789, at *4 (N.D. Ga. Aug. 9, 2024) (disciplinary authority of battalion chief found to be non-exempt limited to "prepar[ing] standard documentation in response to mundane and objective infractions").

In sum, the facts relied upon by the County in support of the district court's determination that the BCs' primary duty is management are in dispute, and because the record contains ample evidence from which a reasonable jury could find that the BCs' primary duty is first response, summary judgment was inappropriate.

---

[3] Similarly, the County cites the BCs' role in reviewing and modifying SCFD policies in support of its argument that their primary duty is management. *See* Brief of Appellee at 9. However, policy development is not unique to the BC role; a fire fighter of any rank may be asked to participate in policy development depending upon the individual fire fighter's expertise, knowledge, and/or experience in a particular policy area. Doc. 80-3 at 23, ¶ 74.

## B. Hiring/Firing Prong

With respect to the other disputed prong of the executive exemption – the hiring/firing prong – the County asserts that the undisputed facts demonstrate that the SCFD gives "particular weight" to the BCs' recommendations on the hiring, firing, or other changes in status of their subordinate employees. Like the question of the BCs' primary duty, the facts relied upon by the County are in dispute.

The County asserts that, with respect to the hiring and promotional processes, BCs "participate in review panels and make recommendations to higher levels of management." Brief of Appellee at 25. This statement greatly overstates the BCs' role in these processes. Unlike the Battalion Chiefs in *Emmons*, whose participation on hiring panels was integral and whose scores of candidates for hire were given special consideration by the hiring authority, the BCs here serve on hiring and promotional panels on a purely voluntary basis and ask candidates a set of pre-determined interview questions. Doc. 80-2 at 23, ¶ 70; Doc. 80-3 at 22, ¶ 71. Crucially, the panel's scores are aggregated, such that a BC's recommendation is afforded equal weight to all other members on the panel — which can include fire fighters of any rank. *Id.* The County fails entirely to contend with these facts. *Cf. Emmons*, 982 F.3d at 257 (recommending termination or suspension "clear role of BCs").

Further, the record contains conflicting evidence as to the extent to which the hiring and promotional panels' aggregated recommendations are given any weight. While the County cites testimony that the SCFD purportedly views BCs' recommendations with great emphasis, *see* Brief of Appellee at 25, the BCs themselves provided contrary testimony — explaining that the panels' recommendations are given little weight and that the SCFD has ignored the recommendations of the panel on numerous occasions. Doc. 80-2 at 23, ¶ 70; Doc. 80-3 at 22, ¶ 71.

Further, several BCs disputed the County's assertion that they provide recommendations on more severe forms of discipline. *See* Doc. 80-2 at 24, ¶ 72 ("BCs do not provide recommendations on firing other bargaining unit members, or any other employees."); Doc. 80-3 at 22, ¶ 73 (same); Doc. 69 at 17, 15:3-11 (stating BCs cannot recommend written reprimands); Doc. 74 at 23, 21:1-4 (same); Doc. 75 at 26, 24:5-12 (same).

Relatedly, while BCs conduct evaluations of probationary Lieutenants, this job duty represents a tiny fraction of their work; on average, these evaluations amount to no more than four hours per year. Doc. 80-2 at 23, ¶ 71. And critically, in stipulating to the BCs' inclusion in the bargaining unit with their fellow line personnel, the County conceded that the BCs' job duties with respect to discipline and evaluation of subordinates are of such a limited nature as to preclude the

existence of a supervisory conflict of interest. *See* FPERC Decision, Sarasota-Manatee Professional Firefighters and Paramedics, Local 2546, IAFF, No. UC-99-040 (Jan. 18, 2000) ("Battalion Chiefs no longer evaluate subordinates in a manner which may adversely affect any term or condition of employment.").

On these facts, a reasonable jury could conclude that the BCs do not satisfy the fourth prong of the executive exemption. Accordingly, the district court erred in granting summary judgment to the County.

### III.    The County Reads the First Responder Regulation Too Narrowly.

The County argues that the BCs do not fall under the "First Responder Regulation," 29 C.F.R. § 541.3(b), because their primary duty is management. Specifically, the County asserts that the BCs are primarily managers rather than first responders because the circumstances in which BCs participate in frontline firefighting are "rare," and that the nature of the IC role and the BCs' in-station duties removes them from the purview of the First Responder Regulation.

These arguments are unpersuasive. First, as demonstrated above, the record is replete with evidence that the BCs frequently engage in frontline firefighting when serving in the various non-IC roles on an incident scene, and that, even in the IC role, the circumstances of the scene may necessitate the BC acting in the offensive, tactical mode. But even putting these facts aside, the County's argument with respect to the IC role reflects a shallow understanding of the First Responder Regulation.

The County makes much ado about the BCs' testimony that the IC role requires them to manage the scene of an emergency. According to the County, this fact necessarily precludes BCs from being primarily first responders. But the First Responder Regulation cannot be read so narrowly.

Importantly, the First Responder Regulation "states that first responders are not exempt executives even if they 'also direct[] the work of other employees in the conduct of an investigation or fire.'" *Maestas v. Day & Zimmerman, LLC*, 664 F.3d 822, 828-29 (10th Cir. 2012) (quoting 29 C.F.R. § 541.3(b)(2)). Thus, "management-like tasks undertaken in conjunction with, or directly related to, primary first responder duties do not turn a first responder into an exempt executive or administrator." *Morrison*, 826 F.3d at 767 (citing *Mullins v. City of New York*, 653 F.3d 104, 115 (2d Cir. 2011)).

Thus, the fact that the IC role requires a BC to direct his subordinates' response to the emergency incident does not transform the BC into an exempt executive. The IC role is necessarily tied to — and cannot be untangled from — primary first responder duties. For instance, upon arriving to the scene of a fire, the IC must conduct a 360-degree walk-around of the burning structure (donning full PPE when necessary) to assess hazards on scene. *See* Doc. 80-3 at 11, ¶32. The County's characterization of the IC role as being removed from the incident notwithstanding, it is these real-time, on-scene observations that equip the BCs with

the information necessary to direct the emergency response — as well as to participate in the response as needed.

Recognizing the first responder work inherent in the on-scene management of an incident (and consistent with the directives of 29 C.F.R. § 541.3 (b)(2)), courts have rejected the argument that management of the incident scene is exempt managerial work, as the County suggests here. *See, e.g.*, *Barrows* 944 F. Supp. 2d at 604 (citing 29 C.F.R. § 541.3 (b)(2) and rejecting argument that plaintiff captains were exempt because their primary duty at a fire scene was management of the response). In a recently issued decision, the U.S. District Court for the Northen District of Georgia summarized the interplay between the First Responder Regulation and on-scene management of an incident as follows:

> In the Roswell Fire Department, Battalion Chiefs are the incident commanders when they are on the scene of an emergency. During an emergency call, the Battalion Chief is responsible for assessing the dangers faced by those on the scene and directing the first responders around him to respond appropriately. However, Plaintiff's supervision of other firefighters during incident responses is not 'management' under the executive exemption.

*Vickery*, No. 1:22-cv-02986-VMC, 2024 BL 372789, at *8 (citing *Mullins*, 653 F.3d at 108).

The above reasoning applies with equal force here. The BCs are not exempt managers because of the role they play as ICs – particularly given the record

evidence that amply demonstrates that the IC role still requires BCs to engage in tactical firefighting operations, just like other members of the bargaining unit.

Further, several of the BCs' in-station duties, while managerial in nature, are so closely tied to first response as to fall under the First Responder Regulation. BCs facilitate training of their respective battalions, but they also participate in these trainings alongside their fellow line personnel. *See* Doc. 80-3 at 6-7. Additionally, while not on an incident scene, BCs conduct rounds of the stations in their battalions, passing along information and receiving updates from the station officers. Doc. 80-3 at 23, ¶75. When the BCs conduct these rounds, they must continue to be in the "response ready" state, meaning that they must drop everything and respond to an incident if dispatched. *Id.*

These kinds of tasks, despite being removed from the incident scene, are nonetheless first responder duties under the First Responder Regulation. *See Morrison*, 826 F.3d at 771; *Barrows*, 944 F. Supp. 2d at 604; *Vickery*, No. 1:22-cv-02986-VMC, 2024 BL 372789 at *2. As such, the County's narrow reading of the regulation is not supported.

## CONCLUSION

For the reasons stated above, this Court should reverse the district court's decision and remand this case for a jury trial.

Respectfully Submitted,

<u>*/s/ Tamara Imam*</u>
Tamara Imam
Lauren P. McDermott
Mooney, Green, Saindon, Murphy &
Welch, P.C.
1620 Eye Street NW, Suite 700
Washington, D.C. 20006
timam@mooneygreen.com
lmcdermott@mooneygreen.com
(202) 783-0010
*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) as the brief contains 3548 words, excluding those parts exempted by 11th Cir. Local R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) as this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

*/s/ Tamara Imam*
Tamara Imam

## CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2025, a copy of the brief was served on all counsel of record via CM/ECF.

*/s/ Tamara Imam*
Tamara Imam
Lauren P. McDermott
Mooney, Green, Saindon, Murphy &
Welch, P.C.
1620 Eye Street NW, Suite 700
Washington, D.C. 20006
timam@mooneygreen.com
lmcdermott@mooneygreen.com
(202) 783-0010
*Counsel for Plaintiffs-Appellants*